**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | |
|---|---|
| **BETTY ANN SCHULTZ,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 7:12-CV-00511** |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

Plaintiff Betty Ann Schultz ("Schultz") filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), finding her not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Schultz alleges she is unable to work due various physical and mental impairments, including most notably a heart condition and depression. Specifically, Schultz argues that the Administrative Law Judge ("ALJ") made an improper determination of which of her impairments were severe, formulated a residual functional capacity that was unsupported by the evidence, and erroneously evaluated the opinion of Schultz's treating cardiologist.

This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before me by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The parties have fully briefed all issues and the case is now ripe for decision. I have carefully reviewed the administrative record, the legal memoranda, and the applicable law. I conclude that the ALJ's decision is supported by substantial evidence on all grounds asserted. As such, I **RECOMMEND DENYING** Schultz's

1

Motion for Summary Judgment (Dkt. No. 10), and **GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 12.

## STANDARD OF REVIEW

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). This court limits its review to determining whether substantial evidence exists to support the Commissioner's conclusion that Schultz failed to demonstrate that she was disabled under the Act. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). If such substantial evidence exists, the final decision of the Commissioner must be affirmed. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Schultz bears the burden of proving that she is disabled within the meaning of the Act. English v. Shalala, 10 F.3d 1080, 1082 (4th Cir. 1993) (citing 42 U.S.C. § 423(d)(5)). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects her ability to perform daily activities or certain forms of work. Rather, a claimant must show that her impairments prevent her from engaging in all forms of substantial gainful employment given her age, education, and work experience. See 42 U.S.C. §§ 423(d)(2).

The Commissioner uses a five-step process to evaluate a disability claim. <u>Walls v. Barnhart</u>, 296 F.3d 287, 290 (4th Cir. 2002). The Commissioner asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to her past relevant work; and if not, (5) whether she can perform other work. <u>Johnson v. Barnhart</u>, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460-462 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at step five to establish that the claimant maintains the Residual Functioning Capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); <u>Taylor v. Weinberger</u>, 512 F.2d 664, 666 (4th Cir. 1975).

## STATEMENT OF FACTS

### Social and Vocational History

Schultz was born on February 9, 1949 (Administrative Record, hereinafter "R." at 76), and is considered a person of advanced age under the Act. 20 C.F.R. § 404.1563(e). Schultz is insured through June 30, 2011 (R. 15, 77); therefore she must show that her disability began before the end of her insurance period, and existed for twelve continuous months to receive DIB. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). Schultz completed school through 12th grade in 1967. R. 226. Schultz held a number of jobs between 1983 and 2007, including positions as a secretary, a bank customer service representative, a retail sales associate, and in real estate sales. R. 220, 239. Although Schultz reported that she stopped

working in August 2007 (R. 219) the record shows that she may have continued to work thereafter. R. 533, 650, 653. Schultz reported that during the relevant period, she had the capacity to take care of her grandson, prepare frozen meals, do occasional laundry, go outside daily, shop for groceries, manage her finances, and socialize over the phone. R. 251–56.

## Claim History

Schultz protectively filed for DIB on November 1, 2007, initially claiming that her disability began on May 5, 2004. R. 77. Schultz later amended her alleged disability onset date to September 1, 2007. R. 13. The state agency denied her application at the initial and reconsideration levels of administrative review. R. 94–98, 104– 09. On May 6, 2010, ALJ Steven A. De Monbreum conducted a brief initial hearing at which the ALJ requested Schultz's psychiatric counseling records and ordered a consultative psychiatric assessment. R. 66–75. The matter was continued to December 2, 2010, when ALJ De Monbreum held a second hearing to more fully consider Schultz's disability claim. R. 33–65. On that date Schultz was represented by an attorney, Susan Waddell, at the hearing, which included testimony from Schultz and vocational expert Michael Gore. R. 33.

On January 7, 2011, the ALJ entered his decision denying Schultz's claims. R. 13–26. The ALJ found that Schultz suffered from the severe impairments of fibromyalgia, atrial fibrillation status post surgical ablation, diabetes mellitus, obesity, and hypertension. R. 15. The ALJ determined Schultz's other impairments to be non-severe, including aneurysms, pituitary tumor, mild sleep apnea, hearing problem, osteopenia in the hip, depression, and anxiety. R. 20. The ALJ further found that Schultz's severe impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 22. The ALJ determined that Schultz retained the residual functional capacity ("RFC") to perform light work, with a number of

additional limitations.[1]  R. 22.  The ALJ determined that Schultz could return to her past relevant work as a real estate sales agent, household appliance salesperson, mortgage clerk, and secretary. R. 25. Thus, the ALJ concluded that she was not disabled.  R. 26.  On September 11, 2012, the Appeals Council denied Schultz's request for review (R. 1–5), and this appeal followed.

## Medical Evidence

### a. Heart Condition

Schultz has a long history of heart arrhythmia, specifically atrial fibrillation that occasionally caused symptoms of a racing heart, chest pain, and fatigue. By the time of Schultz's alleged onset date of September 1, 2007, Schultz had already undergone a minimally invasive maze procedure for atrial fibrillation in January 2007. R. 313–15. When Schultz was released from that surgery she was told by her surgeon that "she could resume fairly normal activity as tolerated." R. 310. Schultz continued to receive cardiac care throughout 2007 from specialist William J. Welch, M.D. for lingering chest pain and heart palpitations.  In in December 2007, Schultz reported to Dr. Welch that she had nearly daily atrial fibrillation, accompanied with fatigue, palpitation, and a racing heart. R. 512.

On March 21, 2008 William Humphries, M.D. performed a consultative examination, with Schultz's chief medical complaint of atrial fibrillation. R. 502–505. Dr. Humphries noted that Shultz had "[t]achycardia with irregular irregularity without murmur, gallop, or rub. No peripheral edema." R. 504. Dr. Humphries diagnosed Schultz with uncontrolled atrial fibrillation, and told Schultz to notify her family doctor of that finding. R. 505. Based on his examination and review, Dr. Humphries concluded that Schultz would be limited to sitting, standing and walking six hours in an 8-hour workday, to lifting 50 pounds occasionally, and 25 pounds frequently. R.

---

[1] Specifically, the ALJ provided that Schultz could never climb ladders, ropes, or scaffolds; only occasionally use ramps, climb stairs, balance, kneel, crouch, crawl, and stoop or bend; and that she should avoid concentrated exposure to hazards such as machinery and heights. R. 22.

505. Furthermore, Schultz would be limited to occasional climbing, kneeling, and crawling but would be able to stoop, crouch, and be around hazards without restriction. Dr. Humphries stated that she would not be able to perform repetitive production type gripping, grasping or foot control with her extremities. R. 505.

In April 2008, Dr. Welch noted that Schultz was having "significant amounts of atrial fibrillation by her symptoms" that was under poor control and aggravated by stress. R. 510. To address Schultz's ongoing reported symptoms, Dr. Welch adjusted Schultz's medication. The next month at a visit to her family practitioner, Schultz complained of fatigue, but denied chest pain, palpitations, and edema at that time. R. 524. At a July 8, 2008 follow up with Dr. Welch, Schultz's symptoms of heart palpitation and atrial fibrillation were completely gone, and Schultz had returned to work. R. 533. An EKG at the time showed atrial fibrillation. R. 534. Dr. Welch continued Schultz on the same medication and scheduled a follow-up appointment in six months.

Donald Williams, M.D. performed a Physical Residual Functional Capacity Assessment on December 9, 2008. R. 538–44. Dr. Williams noted a primary diagnosis of atrial fibrillation and a secondary diagnosis of polyarthropathy. Dr. Williams limited Schultz's RFC to lifting and/or carrying occasionally 20 pounds, frequently lifting 10 pounds, standing and/or walking for a total of about 6 hours in an 8-hour workday, sitting for a total of about 6 hours in and 8-hour workday, and unlimited ability to push and/or pull. R. 539. Dr. Williams further found that Schultz had occasional postural limitations but no manipulative, visual, or communicative limitations. R. 540–41. Finally, Dr. Williams limited Schultz's environmental conditions to avoid concentrated exposure to hazards such as machinery and heights. R. 541.

At her next visit to Dr. Welch in January 2009, Schultz reported that she was feeling better despite fatigue and difficulty breathing, and denied chest pain. R. 900. Dr. Welch noted

these continued symptoms were likely related to her atrial fibrillation and medication regimen. R. 901. Schultz again denied chest pain, dyspnea, and edema to her family doctor on February 17, 2009, although she continued to feel fatigued. R. 904. After reviewing an echocardiogram and Holter monitor, Dr. Welch noted that Schultz had poor heart rate control and mild cardiomyopathy. R. 912. On February 26, 2009, Dr. Welch noted that Schultz was "clearly disabled at this time due to the cardiomyopathy and poor heart rate control." R. 913.

In May 2009 Schultz was admitted to the hospital as the result of chest pain and an abnormal stress test, and doctors performed a cardiac catheterization with coronary angiography. R. 555. Schultz was pain free for the duration of the hospital stay, had no evidence of coronary disease, and was discharged home the next day and placed on additional prescription medication. R. 707. In June 2009, Schultz reported no chest pain or worsening of shortness of breath to her family doctor. R. 931. At a post-catheterization follow up, Dr. Welch noted that overall Schultz was doing better, and that her heart rate had been better controlled on new medication. R. 695. In September 2009, Schultz reported that she has not had any severe episodes of palpitations in several months and that her atrial fibrillation had been "relatively well controlled" by medication. R. 644. Indeed, she stated that she had not had a "rapid ventricular response associated with her atrial fibrillation" in over a year. R. 644. By October 8, 2009, Dr. Welch noted "no cardiac issues" and that Schultz "overall feels reasonably well." R. 699. In December 2009, Dr. Welch found no reason "from a heart standpoint" to withhold Schultz from reasonable amounts of exercise. R. 990.

In January 2010, Schultz underwent a scheduled embolization for an asymptomatic carotid cave aneurysm, and was discharged the same of the procedure. R. 619–20. Schultz was not given any work or activity related discharge restrictions, but was asked to schedule follow up

appointments. R. 620. At a hospital visit for pneumonia in February 2010, Schultz again reported

no chest pain, and the attending physician found a normal heart rate, with regular rhythm and

intact distal pulses. R. 744. A chest x-ray showed a mild cardiomegaly, but the diagnostic

impression indicated pneumonia or asymmetric pulmonary edema as the source of Schultz's

shortness of breath at that time. R. 746.

b. *Mental Impairments*

Schultz also alleges debilitating depression and anxiety that has rendered her unable to

work. Until late 2009, evidence of Schultz's alleged mental impairments appears only in

treatment notes and reports of non-specialists. For example, Dr. Welch, a cardiologist, noted

Schultz's depression and use of antidepressants during visits in 2007, 2008, and 2009 but did not

treat Schultz for depression or refer her to a specialist. R. 510, 512, 533, 691. At other times

during this period, though, treatment notes from Schultz's general family practitioner reflect that

Schultz had a normal or improved mood. R. 526, 915, 922, 946.

While performing his consultative physical exam in March 2008, Dr. Humphries found

Schultz cooperative, alert, and properly oriented. R. 505.  Schultz's intelligence, thought, and

idea content was normal, and her memory was intact for both recent and remote events. R. 505.

Dr. Humphries noted that Schultz should have been able to handle her own disability funds if

they were awarded at that time. R. 505. A psychiatric review by Hillel Raclaw, Ph.D. on January

6, 2009 indicated that Schultz had depression, "but the impact on adaptive functioning is

minimal. The depression is per se non-severe." R. 551.

On February 17, 2009, Schultz reported to Mary C. Carver, FNP at Vinton Parkway

Family Practice that she was depressed, angry, and "very down." R. 904.  Nurse Carver

encouraged Schultz to go to counseling, get regular exercise, use stress reduction measures, sleep

more, and avoid illicit substances. R. 907. Nurse Carver noted an improved mood in March 2009. R. 915. In May 2009, Nurse Carver noted that Schultz was compliant with her medication and that she had improved or limited problems with concentration, irritability, focus, and memory at that time. R. 922. Nurse Carver again encouraged Schultz in June 2009 to go to counseling and to make lifestyle changes. R. 934. On July 14, 2009, Schultz reported that her mood and fatigue were "much better" on the antidepressant Wellbutrin. R. 946. Schultz complained of a "flaring of her anxiety," sleeping problems, concentration, irritability, focus, and memory in November 2009. R. 965–66. Nurse Carver noted marital problems as a source of Schultz's frustrations. R. 966.

Schultz saw mental health specialist David W. Hartman, M.D. on November 17, 2009 for a psychopharmacologic management session. R. 614–15. Schultz reported struggles with her memory, depression, and irritability. Dr. Hartman noted that Schultz was "very discouraged and has trouble with her memory, not thinking clearly, has trouble with concentration." R. 614. Dr. Hartman diagnosed Schultz with "recurrent depression, moderate" and recommended a more aggressive course of treatment, starting with increasing the dosage of Cymbalta while continuing to take Wellbutrin. R. 614–15. At a follow up appointment a few weeks later, Schultz reported to Dr. Hartman that overall she felt better and Dr. Hartman found Schultz's depression to be already in partial remission. R. 612. Dr. Hartman recommended the same medication for Schultz going forward. Treatment notes from Schultz's family practitioner on December 31, 2009 noted that her mood was stable with occasional worrying but that she was doing "remarkably well." R. 979.

Jeffrey B. Luckett, Ph.D. of the Virginia Department of Rehabilitative Services conducted a consultative evaluation of Schultz on June 1, 2010. R. 1335–42. Dr. Luckett found

that, "from a strictly psychological standpoint, the claimant would be able to work an 8-hour day and 40-hour week." R. 1341. Dr. Luckett further found that Schultz was capable of performing simple and repetitive tasks, as well as more difficult and complex tasks. R. 1342. Schultz would also be able to work with public, peers, and supervisors in an appropriate manner and would not require specialized supervision. R. 1342. At a second examination on August 17, 2010, Dr. Luckett made identical functional findings. R. 1355. On both occasions Dr. Luckett gave Schultz a Global Assessment of Functioning (GAF) of 48. R. 1341, 1355. In a letter clarifying his two examination reports, Dr. Luckett stated that Schultz would have "moderate impairment from a psychological standpoint in areas such as work, school, family relationships, judgment, thinking or mood." R. 1360.

### c. Diabetes, Hypertension, and other conditions

Evidence of a number of other medical conditions appears throughout the record. In late 2007 Schultz was diagnosed with Type II diabetes, obesity, hypertension and hyperthyroidism and it was recommended that she monitor her glucose, make lifestyle changes, and lose weight. R. 491, 489. Dr. Humphries, in his March 2008 consultative examination diagnosed noninsulin dependent diabetes, obesity, polyarthropathy and mild degenerative joint disease in Schultz's hips, ankles, hands and feet. R. 505. Schultz received treatment in 2009 for sleep mild apnea which contributed to symptoms of fatigue. R. 588–601. During the relevant period Schultz was also diagnosed with fibromyalgia and gastroesophageal reflux disease, although the symptoms came and went and did not appear to be debilitating. R. 904, 915, 979.

Schultz took medication for her hypertension, which was adjusted at various times in an effort to achieve control over the condition. R. 907, 951. When compliant with her medication, Schultz's hypertension was for the most part under good control. R. 926, 935, 979. At times

Schultz's diabetes was under poor control, although Schultz admitted to doctors that she had a poor diet. R. 918, 935. The course of treatment for Schultz's diabetes was conservative, and included medication, monitoring, and regular exercise. R. 951.

After experiencing blurry vision, an MRI in July 2009 revealed a pituitary adenoma (R. 732) and Schultz underwent surgery in December 2009. R. 630. When discharged, doctors ordered Schultz off work for six weeks, limited her lifting for four weeks, but allowed her to be as active as tolerated. R. 632.

In their consultative opinions, both Dr. Humphries and Dr. Williams considered the myriad of conditions present in 2008 alleged by Schultz when assessing Schultz's RFC. Each concluded that Schultz had only minor work limitations, as detailed above. R. 502–506, 538–544.

### Schultz's Testimony

At the administrative hearing, Schultz testified to the "long list" of impairments that she alleged prevented her from working during the relevant period. R. 36. Schultz described herself as a "walking time bomb" due to the anxiety and stress stemming from her 2007 heart surgery, and explained her difficulty concentrating and sleeping. R. 37–38. As to her physical ailments, Schultz testified that her pain from fibromyalgia would come and go and affect different parts of her body at different times. R. 39. Schultz stated that her heart races when she is anxious because of her atrial fibrillation, and that doctors told her to keep relaxed to prevent her aneurysm from rupturing. R. 39–40. When asked what keeps her from working, Schultz stated that her "entire outlook and attitude has changed. The fact that I don't want to be with people, and I don't want to be in public." R. 44. Schultz also testified that she experienced fatigue and occasional dizziness. R. 47.

## ANALYSIS

Through her brief and oral argument, Schultz identifies a number of objections to the ALJ's decision to deny benefits. The myriad of arguments boils down to three main contentions. First, Schultz alleges that the ALJ committed error in finding certain impairments nonsevere at step two, most notably Schultz's cardiomyopathy. Second, Schultz contends that the ALJ ignored her alleged mental impairments both at step two and while formulating Schultz's RFC at step four. Finally, Schultz argues that the ALJ accorded improper weight to the opinion of a treating physician. Throughout all of these arguments, Schultz also challenges the ALJ's determination of Schultz's credibility.

## Severe Impairments

Schultz contends that the ALJ committed error when determining which of Schultz's alleged impairments were "severe" under the regulations. The ALJ found that Schultz's fibromyalgia, atrial fibrillation, diabetes, obesity, and hypertension were severe impairments. R. 15. However, the ALJ determined that Schultz's physical impairments of aneurysms, pituitary tumor, sleep apnea, hearing problems, and osteopenia were non-severe because "they have not produced significant, work-related functional limitations."[2] R. 20. At oral argument, Schultz focused the Court's attention to the fact that the ALJ did not address Schultz's one-time diagnosis of cardiomyopathy in his opinion denying benefits. I find that the ALJ did not commit error in failing to address Schultz's cardiomyopathy at step two, and that substantial evidence supports his determination of which of Schultz's impairments were severe.

An impairment is non-severe when it causes no significant limitations in the claimant's ability to work.  20 C.F.R. § 404.1521(a). Schultz as claimant bears the burden of proof in

---

[2] The ALJ also determined Schultz's mental impairments to be non-severe, a finding that Schultz challenges and is discussed separately below.

showing that these impairments were severe. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995). "[A]n impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (citing Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984).

The ALJ's finding that Schultz's atrial fibrillation was a severe impairment adequately captures the heart condition and symptoms that Schultz alleges interfered with her ability to work. These symptoms, when present, included primarily a racing heart, chest pain, and fatigue. A careful review of the medical records shows that the symptoms Schultz's complained of were repeatedly attributed to atrial fibrillation and not cardiomyopathy. R. 490–91, 502–507, 509–510, 512–13, 524, 533–34, 688–89, 691–94, 699–700, 706–712, 926, 941–42. This includes the records of Dr. Welch, who mentioned cardiomypathy only once on February 26, 2009 despite the many visits made by Schultz, including those where objective imaging was reviewed. R. 509–510, 512–13, 533–34, 688–89, 691–94, 699–700, 706–712, 941–42. Even when Dr. Welch diagnosed Schultz with cardiomyopathy, he described the condition as mild. R. 912. Furthermore, diagnostic studies from Schultz's May 2009 cardiac catheterization demonstrated atrial fibrillation but "no active cardiopulmonary disease." R. 890. Dr. Welch appeared to accept these findings, evidenced by the fact that his final diagnoses post-catheterization included atrial fibrillation but not cardiomyopathy. R. 887.

It is not as though the ALJ ignored Schultz's alleged heart-related impairments. To the contrary, the symptoms of Schultz's heart condition were properly a focus of his review of the medical evidence throughout his written opinion. The medical evidence does not suggest that any

myopathy Schultz may have had contributed to any limitations that were not already subsumed by her severe impairment of atrial fibrillation. Given the foregoing evidence and thorough review of the medical records by the ALJ, I do not find that the ALJ erred in not finding severe Schultz's cardiomyopathy.

As to the other physical impairments at issue—sleep apnea, pituitary tumor, and aneurism—the ALJ's finding that these impairments were non-severe is supported by substantial evidence. Although the record documents the existence of these conditions, very little evidence demonstrating any resulting functional limitations exists. Specialists found Schultz's sleep apnea to be mild and Schultz responded well to conservative treatment. R. 600. It is unclear from the records what, if any, symptoms could be directly attributed to Schultz's pituitary tumor, but records show that Schultz did very well post-operatively and that doctors placed temporary, light restrictions on her activity following the surgery. R. 630–31. Likewise, Schultz's carotid cave aneurism was asymptomatic and was only incidentally found during her pituitary surgery. R. 631. Upon discharge for operation on the aneurism, Schultz was treated with medication, given a six month follow up appointment, and was not subject to any activity restrictions. R. 620. These impairments, while medically determinable, had only minimal effect on Schultz's ability to work. Therefore, the ALJ did not err in finding them non-severe at step two.

### **Mental Limitations**

Schultz alleges that the ALJ made improper determinations regarding her alleged mental impairments at both step two, in finding the impairments non-severe, and at step four, in failing to adequately account for the impairments in the final RFC. At step two, the ALJ determined that Schultz's depression and anxiety did "not cause more than minimal limitation" in Schultz's ability to work and therefore found the impairments non-severe. R. 20. At step four, the ALJ

reviewed the evidence of Schultz's depression and anxiety, but ultimately concluded that Schultz had "no more than mild mental limitations" and did not place any mental restrictions in her RFC. R. 22. Substantial evidence supports the ALJ's decision on both fronts.

The majority of evidence in the record regarding Schultz's mental health comes from her family practitioner and heart doctors. These records do little more than document Schultz's subjective complaints and a conservative course of treatment featuring medication and lifestyle changes. Schultz briefly saw a psychologist, Dr. Hartman, late in 2009 when her symptoms of depression and anxiety appear from the record to have been at their peak. R. 614–15. However, with an adjustment in medication, Dr. Hartman found Schultz's mood stable and depression in remission within weeks of her initial visit. R. 612, 979. Like her family practitioner and heart doctors, Dr. Hartman at no time placed Schultz on any work-related restrictions related to her mental health, nor gave any opinion regarding disability.

The opinions of Schultz's mental functionality support the ALJ's decision. In January 2009, state agency doctor Hillel Raclaw, Ph.D. determined that Schultz's depression was *per se* non-severe. R. 551. Dr. Luckett, a licensed clinical psychologist who performed two extensive consultative examinations in 2010, determined that from a psychological standpoint Schultz was capable of working full time with no limitations. R. 1334–42, 1348–55. On both occasions, Dr. Luckett stated that Schultz's mental health would have only a "mild" impact on her do work-related activities. R. 1343, 1347. Dr. Luckett also described Schultz's "quite functional" ability to perform work tasks. R. 1347.

The ALJ also did not err in discrediting Schultz's subjective complaints contained in the record, as substantial evidence supports this assessment. Various statements in the record support the finding that Schultz's symptoms of mental impairments were not as severe as alleged. For

example, Schultz reported in her disability application that she recently worked as much as 12-to-14 hour days as a self-employed real estate agent. R. 216. However, in an examination with Dr. Luckett, Schultz stated that her depression began in the 1980's and that she has been depressed 50% of the time since then. R. 1339. Furthermore, as the result of his testing, Dr. Luckett indicated that Schultz's subjective impressions were likely to be more negative than was objectively the case. R. 1360. Overall, the medical records reveal that the ALJ was supported in discrediting Schultz's objective complaints to the extent that other evidence was contradictory or unsupportive.

For these reasons, I find no error on the part of the ALJ in determining Schultz's mental impairments non-severe and declining to provide for mental limitations in the final RFC.

### Treating Physician

Schultz contends that the ALJ erred in according no weight to the opinion of Dr. William Welch, Schultz's treating cardiologist when formulating Schultz's RFC. In Dr. Welch's treatment notes from February 26, 2009, Dr. Welch stated that Schultz was "clearly disabled at this time due to the cardiomyopathy and poor heart rate control." R. 913. In his opinion, the ALJ reviewed Dr. Welch's records and opinion, but found that Dr Welch's own treatment notes and Dr. Humphries consultative exam did not support disability, and that the bulk of hearing testimony surrounded Schultz's mental impairments. R. 24. Accordingly, he gave Dr. Welch's opinion little weight. I find that substantial evidence supports this decision.

The social security regulations require that an ALJ give the opinion of a treating source controlling weight, if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The ALJ must give "good reasons" for not

affording controlling weight to a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); Saul v. Astrue, 2011 WL 1229781, at *2 (S.D. W.Va. March 28, 2011). Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. § 416.927(c)(2)-(5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010) (citations omitted).

Good reasons in the record exist for discrediting the opinion of disability rendered by Dr. Welch. As noted by the ALJ, Dr. Welch's own treatment notes fail to support his summary conclusion that Schultz's was disabled under the regulations, and contrary medical evidence and opinion countervail. Although Dr. Welch was a heart specialist with some history of treating Schultz, he never placed Schultz on work-related limitations but abruptly concluded in February 2009 that she was unable to work. However, prior to rendering this opinion, Dr. Welch noted in July 2008 that Schultz's symptoms of heart palpitation and atrial fibrillation were completely gone. R. 533. Notably, in the very same treatment note where he concluded that Schultz was disabled, Dr. Welch described her cardiomyopathy as "mild." R. 912. At the end of 2009, Dr. Welch noted that "from a heart standpoint" there was no reason to hold Schultz back from reasonable amounts of exercise. R. 990. These internal inconsistencies in Dr. Welch's own treatment notes undermine his conclusion that Schultz was "clearly disabled" in February 2009.

Although they were rendered roughly a year prior, the consultative opinions of Dr. Williams and Dr. Humphries likewise contradict Dr. Welch's opinion that Schultz was disabled as the result of her heart condition. Both Dr. Williams and Dr. Humphries found similarly minimal, although not identical, restrictions on Schultz's ability to work. R. 502–505, 538–44. Neither assessment comes close to the dire conclusion of Dr. Welch made in his treatment notes in February 2009.

Schultz's own statements also cut against Dr. Welch's opinion as well. Just days before Dr. Welch's opinion of disability, Schultz denied chest pain, dyspnea, and edema to her family practitioner. R. 904. Furthermore, when examined by consultative psychologist Dr. Luckett in June 2010, Schultz described her heart condition as a "minor thing" and that it was the "other things that are bugging me," referring to her other physical issues. R. 1337. Finally, as the ALJ noted, Schultz identified her mental outlook, and not any physical ailment, as the reason why she could not return to work. R. 44. This evidence further supports the ALJ's decision to discredit Dr. Welch's opinion.

The ALJ, supported by substantial evidence, was entitled to discredit Dr. Welch's opinion and accord it no weight when developing Schultz's RFC. Accordingly, I find that the ALJ did not commit error and that remand or reversal is not warranted on this ground.

<u>Conclusion</u>

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, United

States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof.  Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties.  Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

Enter:  January 27, 2014

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge